**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **BOSTON TEA COMPANY, LLC,** | |
| **Plaintiff,** | **1:17-cv-04742 (ALC)** |
| -against- | |
| **BAY VALLEY, LLC,** | **OPINION & ORDER** |
| **Defendant.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Boston Tea Company brings this action against Defendant Bay Valley alleging

Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing, Unfair

Competition, Misuse of Confidential Information, Tortious Interference with Contract, and

Tortious Interference with Prospective Business Advantage all in connection with a licensing

agreement. Plaintiff also seeks injunctive relief and an accounting of Defendant's net sales and

royalty calculations from 2014 through March 31, 2017, or in the alternative permission to

inspect Defendant's books and records. Defendant has now moved to dismiss the Amended

Complaint. ECF No. 29. After careful consideration, Defendant's Motion to Dismiss is

**GRANTED** in part and **DENIED** in part. The Court holds that Plaintiff has failed to state claim

as to Tortious Interference with Contract, Injunctive Relief, and Accounting.

## BACKGROUND

### I.    Scope of License Agreement

Plaintiff Boston Tea is a corporation that sells tea and related products under tradenames

including BOSTON TEA, BENTLEY'S, LORD BUCKLEY'S, and WINDSOR GARDENS.

Am. Compl. ¶ 11, ECF No. 27. Defendant Bay Valley is a national provider of shelf-stable

foods. *Id.* at ¶ 12. In January 1, 2012, Plaintiff entered into a License Agreement with North

American Tea & Coffee Inc., which was ultimately acquired by Bay Valley's parent company

1

TreeHouse. *Id.* ¶ 17. As a result, Defendant succeeded to North American Tea & Coffee Inc.'s rights and obligations under the License Agreement with Boston Tea's consent. *Id.* The License Agreement provided Defendant with an exclusive worldwide license to sell and distribute Plaintiff's products. *Id.* at ¶ 18. The License Agreement expressly prohibited Defendant from entering into a sublicensing agreement absent written consent from Plaintiff. *Id.* at ¶ 19. Plaintiff also entered into an Asset Purchase Agreement with Defendant's predecessor-in-interest, under which Plaintiff "sold certain assets but expressly did not sell, and retained ownership of, certain intangible assets including [Plaintiff's] intellectual property and goodwill related to [Plaintiff's] intellectual property." *Id.* at ¶ 22.

The License Agreement, which was to be for a term of 15 years, required Defendant to provide a "Quarterly Royalty Statement" to Plaintiff within 45 days after the end of each calendar quarter; granted Plaintiff the right to inspect Defendant's books and records; prohibited Defendant from engaging in any "deceptive, misleading or unethical trade practice of advertising, or take or fail to take any action . . . that would reasonably be expected to adversely affect [Plaintiff's] reputation or the goodwill associated with the Intellectual Property . . . ;" and, allowed Plaintiff to terminate the license if Defendant did not achieve annual net sales of at least $3.5 million for two consecutive years *Id.* at ¶¶ 24-28.

**II.     Allegations of Misconduct Prior to Agreement to Terminate License Agreement**

Plaintiff first alleges that in 2014, Defendant failed to provide Plaintiff with certain required statements, which resulted in underpayment of royalties by Defendant. *Id.* at ¶ 33. This prompted Plaintiff to advise Defendant that it was considering terminating the License Agreement due to low sales performance. *Id.* at ¶ 34. In response, Defendant informed Plaintiff that its previous reports were erroneous, and that Defendant had sold significantly more tea than

was reported. *Id.* Though Defendant stated it would provide a corrected report, it never did so. *Id.* Plaintiff also alleges that Defendant failed to provide accurate sales reports for 2015 and 2016, and has yet to provide any final reports for 2016, resulting in underpayment of significant royalties. *Id.*

Plaintiff next alleges that Defendant entered into an unauthorized sublicense agreement with MSRF, a third party. Defendant, however, asserts that its agreement with MSRF was a "Distribution Agreement." *Id.* at ¶ 36. Plaintiff claims that the Distribution Agreement gave MSRF exclusive rights to sell Plaintiff's brands in North America, and that MSRF was Defendant's de facto agent during the relevant period making Defendant liable for the acts and omissions of MSRF. *Id.* at ¶¶ 37, 43.

Plaintiff also alleges that MSRF engaged in actions that knowingly injured Plaintiff's sales, customer relations, and goodwill, and that MSRF promoted and sold competing products even though the Distribution Agreement expressly prohibited it from doing so. *Id.* at ¶ 44. For example, under the Distribution Agreement, MSRF purchased products from Defendant at cost plus 3%. *Id.* at ¶ 46. Plaintiff alleges upon information and belief that MSRF used the raw cost of the products as the "cost" in this calculation, paying Defendant what was essentially a wholesale price for the product. *Id.* Accordingly, Defendant underpaid royalties to Plaintiff because the wholesale price was lower than the price Defendant could have received for the products had Defendant sold directly to retailers. *Id.* Furthermore, MSRF allegedly informed the Specialty Food Association, a trade industry association that Plaintiff was a member of for 40 years that MSRF had purchased Boston Tea and that Plaintiff's membership was transferred to MSRF. *Id* at ¶ 49. As a result, Plaintiff's membership was no longer recognized and its membership rights were accorded to MSRF. *Id.*

### III. Allegations of Misconduct Post Agreement to Terminate License Agreement

After this incident, Plaintiff informed Defendant on October 24, 2016 that it was terminating the License Agreement. *Id.* at ¶ 55. Parties agreed on November 3, 2016 that the License Agreement would be terminated on March 31, 2017. *Id.* Plaintiff alleges that both before and after it terminated the License Agreement, Defendant, through its agent MSRF, began disparaging Plaintiff's business in a series of communications to Plaintiff's customers. *Id.* at ¶ 56. For instance, MSRF falsely told several of Plaintiff's customers, including PriceSmart, Inc. that Plaintiff was out of business and that PriceSmart should order competing tea products instead. *Id.* at ¶ 57.

Defendant and MSRF also allegedly poached Plaintiff's customer relationship with Disney. *Id.* at ¶ 59. According to Plaintiff, Defendant reportedly advised Disney by letter that Defendant was turning Plaintiff's business, including rights under Plaintiff's written memorandum of understanding with Disney, over to MSRF. *Id.* Plaintiff claims that its relationship with Disney was a part of its goodwill that was not transferred to Defendant via the License or Asset Purchase Agreements. *Id.*

Next, Plaintiff alleges that Defendant failed to maintain Plaintiff's e-commerce website, and diverted online orders to Amazon, which were not filled, resulting in lost sales. *Id.* at ¶ 60. Specifically, MSRF allegedly failed to fill numerous orders placed on Amazon resulting in Amazon removing the product from its offerings and turning consumers away from Plaintiff's brand. *Id.* Plaintiff asserts that this resulted in significant losses and will continue to cost Plaintiff hundreds of thousands of dollars in lost revenue each year. *Id.*

Plaintiff also alleges that after the agreement to terminate the License Agreement in November 2016, but before the termination date of March 31, 2017, Plaintiff's customers were

(1) unable to order Plaintiff's product from MSRF, (2) were told that Plaintiff was out of business, and (3) that they should order a different brand of tea in direct contravention of Defendant's obligation to keep selling products under the License Agreement. *Id.* at ¶¶ 61-66. Plaintiff further alleges that Defendant and MSRF intentionally let MSRF run out of inventory and chose not to order additional inventory to meet customer demand. *Id.* ¶¶ 62, 68-69.

Finally, Plaintiff alleges that Defendant via MSRF continued selling and delivering Plaintiff's product in April 2017, after the License Agreement was terminated; that MSRF advised PriceSmart that it should order Plaintiff's BENTLEY brand of tea products with MSRF not Plaintiff; and, that Defendant and MSRF failed to return and continue to use Plaintiff's confidential and proprietary information. *Id.* at ¶¶ 71-72. Plaintiff asserts that the confidential information includes, but is not limited to, customer contact information, sales and order history both before and during the term of the License Agreement, past and present product lists, pricing information, and other proprietary information. *Id.* at 73. Defendant now moves to dismiss the Amended Complaint. Def.'s Mot. Dismiss, ECF No. 29.

## STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 663.

## DISCUSSION

Plaintiff alleges seven causes of action: (1) Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing; (2) Unfair Competition; (3) Misuse of Confidential Information; (4) Tortious Interference with Contract; (5) Tortious Interference with Prospective Business Advantage; (6) Injunctive Relief; (7) Accounting and/or Inspection of Books and Records. The Court hereby dismisses Plaintiff's Fourth, Sixth, and Seventh Causes of Action.

### I.      Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing

Defendant argues that there is no breach of the License Agreement[1] because (1) there was no express sales requirement; (2) there was no requirement to sell products online or to retailers at retail prices; (3) there was no requirement to maintain inventory or sell products through the end of the license; (4) there were no misrepresentations regarding Plaintiff as the License Agreement prohibited Plaintiff from being in business while the License Agreement was in

---

[1] Defendant notes that it is not seeking dismissal of the breach of contract claim based on unpaid royalties in its motion. Def.'s Mem. Supp. Mot. Dismiss 7 n.4, ECF No. 30.

effect; (5) there was no misappropriation of confidential information as Defendant acquired Plaintiff's customer relationships, information, and trade secrets under the Asset Purchase Agreement; (6) there was no impairment of Plaintiff's goodwill as Plaintiff cannot identify an act or actor who did any such thing, and (7) to the extent that MSRF's actions provide the basis for Plaintiff's allegations of breach of contract, (a) MSRF was not an agent of Defendant, and thus Defendant is not liable for its actions, and (b) Defendant had a distribution, not sublicense, agreement with MSRF, but even if there was a sublicense agreement, this would not suggest an agency relationship. Def.'s Mem. Supp. Mot. Dismiss 5-11, ECF No. 30. The Court disagrees.

"Courts applying New York law repeatedly have recognized the duty of good faith and fair dealing, [i.e.,] the implied obligation to exercise good faith not to frustrate a contract into which one has entered." *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) (collecting cases) (internal quotations and brackets omitted). The Second Circuit has held that because "the duty of good faith and fair dealing is implied in every contract, contracting parties' fields of discretion under a contract are . . . generally defined by the parties' intent and reasonable expectations in entering the contract." *Id.* (citing *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 923 n. 8 (2d Cir.1977)).

In interpreting the duty of good faith and fair dealing in the context of licensing agreements, courts have held that "express limitations on marketing obligations do not dampen a licensee's obligation to use reasonable marketing efforts." *Washington v. Kellwood Co.*, No. 05-CV-10034 (SN), 2016 WL 3920348, at *6 (S.D.N.Y. July 15, 2016), *aff'd*, 714 F. App'x 35 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 2029 (2018); *see, e.g., Contemporary Mission, Inc*, 557 F.2d at 923 (holding that mere technical compliance with a contractual provision requiring the defendant to spend $50,000 to promote the plaintiff's rock opera did not meet the defendant's

obligation to use reasonable efforts to promote the opera); *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 680 (2d Cir. 1983) (holding that a publisher with exclusive publishing rights has a duty of good faith to promote a book in such a manner as to "give the book a reasonable chance of achieving market success . . ."); *Poley v. Sony Music Entm't, Inc.*, 163 Misc. 2d 127, 135 (Sup. Ct. 1994), *aff'd*, 222 A.D.2d 308 (1995) (holding that while a contract did not expressly require the defendant to promote an album it chose to release, it "implicitly contains an expectation that [the defendant], totally in control of the sale of the recordings, will promote the sale of the albums released so as to give meaning to the royalties provisions.").

In light of the law, Plaintiff has stated a viable claim that Defendant did not meet its duty of good faith and fair dealing under the License Agreement—Defendant's position that there were no express sale requirements is unpersuasive. Plaintiff had a reasonable expectation under the License Agreement that Defendant would market, promote, and sell their product in such a way that the termination provision would not be triggered. Though the termination provision did not require Defendant to achieve sales of $3.5 million, the provision was a proxy for Plaintiff's minimum expectations. Moreover, while Defendant is correct that the contract did not mandate any particular profit maximizing strategies, Defendant's choice not to engage in certain obvious profit maximizing strategies, such as selling directly to retailers, requiring a more favorable cost calculation from MSRF, or using Plaintiff's existing e-commerce infrastructure may well be evidence of bad faith. To the extent that Defendant had reasonable motivations for its choices, these are questions of fact properly reserved for summary judgment or trial.

Next, Defendant's arguments that there were no misrepresentations made regarding Plaintiff's status as "out of business," that no confidential information was misappropriated, and that Plaintiff's goodwill was not impaired also do not provide a basis for dismissal. Plaintiff's

Amended Complaint is replete with specific allegations of statements made to customers regarding Plaintiff's status as "out of business" and that customers should purchase different tea products. *See* Am. Compl. ¶¶ 57, 61-66, ECF No. 27. These statements, taken together, could lead customers to plausibly (and mistakenly) believe that Plaintiff's products were no more, and thus impaired the goodwill of Plaintiff's brand and products. As to confidential information, there is suggestion that MSRF continued to sell certain of Plaintiff's products, and continued to use confidential information in the process even after the License Agreement was terminated. *Id.* at ¶¶ 71-72. These allegations, if true, state a claim for relief.

Defendant contends, however, that even if the above is true, MSRF was not Defendant's agent and thus it is not liable for any of MSRF's conduct that may have violated Defendant's contractual obligations to Plaintiff. Questions of agency relationships are questions of fact, but can be resolved as a matter of law if the "(1) the facts are undisputed; or (2) there is but one way for a reasonable jury to interpret them." *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012); *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (same).

Here, the facts regarding the nature of the relationship between Defendant and MSRF are not undisputed or amenable to only one interpretation. Despite a provision in the Distribution Agreement that states MSRF is not Defendant's agent, *see* Def.'s Mem. Supp. Mot. Dismiss 3-4, ECF No. 30, MSRF's actions as described in the Amended Complaint, if taken as true, raise questions regarding the relationship between Defendant and MSRF. For example, Plaintiff's allegations that MSRF held itself out as the purchaser of Plaintiff to a trade association, or that Defendant informed Disney that MSRF was taking over Plaintiff's business with Disney, are allegations that could suggest that the Distribution Agreement does not properly characterize the

relationship between Defendant and MSRF. Therefore, whether or not there was an agency relationship in this case is a question of fact that is not properly resolved at the pleading stage.

Defendant next asserts that it had a Distribution Agreement with MSRF, not an unauthorized sublicensing agreement, therefore there was no breach. Like the issue of whether there was an agency relationship, the text of Distribution Agreement does not suffice to ward off Plaintiff's claims that MSRF's actions suggest it had a sublicensing agreement with Defendant. This is a question of fact that cannot be resolved at the pleading stage.

Defendant further argues that (a) there was no sublicense as a matter of law because contracts with plainly worded anti-assignment provisions automatically void assignments, but (b) even if there were a sublicense, there was no agency relationship because sublicensees are not agents. Def. Rep. Supp. Mot. Dismiss 3 n.5, ECF No. 33. Both these arguments are unavailing. First, Defendant's argument that any sublicense would automatically be void does not mean there was no breach of contract. *See generally Sporre S.A. de C.V. v. Int'l Paper Co.*, No. 99 CIV. 2638 (HB), 1999 WL 1277243, at *3 (S.D.N.Y. Dec. 30, 1999) (finding breach of contract where the defendant made an assignment without the plaintiff's consent). And second, assignments do not absolve assignor of their duties under a contract, hence Defendant would be liable for MSRF's actions if there was a sublicense agreement. *Contemporary Mission, Inc.*, 557 F.2d at 924 ("The act of delegation . . . does not relieve the delegant of the ultimate responsibility to see that the obligation is performed. If the delegate fails to perform, the delegant remains liable."). Accordingly, Plaintiff has sufficiently plead a claim of relief for breach of contract.

## II.    Unfair Competition

Defendant argues that the Plaintiff's unfair competition claim must be dismissed because (1) a claim of unfair competition is limited to claims of palming off or misappropriation, neither

of which Defendant is accused of committing; and (2) Plaintiff and Defendant were not competitors during the pendency of the License Agreement, therefore, unfair competition is a logical impossibility. Defendant arguments are without merit.

Defendant cites *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007) for the proposition that the only two theories of unfair competition are palming off and misappropriation. In *ITC*, the New York Court of Appeals considered whether a foreign business is protected from misappropriation under New York unfair competition law. *Id.* at 476-78. In doing so, the Court of Appeals noted that New York courts have long recognized two theories of unfair competition: palming off and misappropriation. *Id.* at 476. The court, however, did not state that these two theories were the *only* acceptable theories of unfair competition.

New York courts have explained that "the law of 'unfair competition' stresses the element of unfairness rather than the element of competition and the term is generally applied to any form of unlawful business injury . . . " *Louis Capital Markets, L.P. v. REFCO Grp. Ltd., LLC*, 9 Misc. 3d 283, 288 (Sup. Ct. 2005); *see also, Duane Jones Co. v. Burke*, 306 N.Y. 172, 190 (1954) ("An injury to a person's business by procuring others not to deal with him or by getting away his customers, if unlawful means are employed, such as fraud or intimidation, or if done without justifiable cause, is an actionable wrong.") (quotations omitted). The courts, however, "have not explicitly defined what types of actions qualify as unfair competition" even though they have accepted palming off and misappropriation as valid bases for the tort. *Louis Capital Markets, L.P.*, 9 Misc. 3d at 288.

While the bounds of unfair competition are uncertain, at least some district courts have considered acts other than palming off and misappropriation as potential valid bases for an unfair competition claim. *See generally, Diehl & Sons, Inc. v. Int'l Harvester Co.*, 445 F. Supp. 282,

291 (E.D.N.Y. 1978) (holding that a claim for unfair competition by disparagement, i.e., injurious falsehood stated a claim for relief); *Aero Media LLC v. World Healing Ctr. Church, Inc.*, No. 12 CIV. 5196 LLS, 2013 WL 2896856, at *3 (S.D.N.Y. June 11, 2013) (holding that without showing that the defendant "got away" with the plaintiff's customers there was no viable claim of unfair competition).

Here, Plaintiff has made sufficient allegations to suggest that Defendant engaged in acts that resulted in some form of business injury. Unlike *Aero Media*, Plaintiff has alleged that MSRF did in fact take actions to divert customers from Plaintiff. If there is an agency relationship or sublicense agreement between Defendant and MSRF, this may be the type of unlawful business injury that the tort of unfair competition was meant to prohibit. To the extent that bad faith is a necessary element of unfair competition, *see Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980), the alleged untrue statements regarding Plaintiff's business and the attempt to market a competing product instead of Plaintiff's product could plausibly support a finding of bad faith.

Finally, while parties were not direct competitors during the pendency of the License Agreement, this does not necessarily bar an unfair competition claim. *See generally Maison Prunier v. Prunier's Rest. & Cafe*, 159 Misc. 551, 559, 288 N.Y.S. 529, 537 (Sup. Ct. 1936) (holding that unfair competition is viable even if parties were not in direct competition so long as the plaintiff could show its reputation extended broadly enough such that the defendants misappropriation of the plaintiff's name would allow the defendant to benefit from the plaintiff's goodwill); *accord ITC Ltd.*, 9 N.Y.3d at 477-78 (affirming *Maison Prunier*); *see also Louis Capital Markets*, L.P., 9 Misc. 3d at 288 (the law of unfair competition stresses unfairness rather than competition). And, the parties were certainly in competition after the termination of the

License Agreement. Therefore, at minimum, there is a viable unfair competition claim based on the post-termination allegations, which also more strongly support a finding of bad faith.

### III.    Misuse of Confidential Information

Defendant argues that there was no misuse of confidential information because (1) there was no confidential relationship between the parties as Defendant purchased Plaintiff's confidential information via the Asset Purchase Agreement; and (2) Defendant had the right to use the information as it was the owner of said information. Def.'s Mem. Supp. Mot. Dismiss 12-13, ECF No. 30.

Plaintiff, on the other hand, argues that because (1) the License Agreement and Asset Purchase Agreement are one integrated agreement pursuant to New York law; (2) Plaintiffs did not sell its intellectual property and goodwill under the Asset Purchase Agreement; and (3) the License Agreement was limited to a 15 year term, that Defendant was on notice "that at some point the right to sell Boston Tea branded products would belong again to [Plaintiff]." Pl.'s Opp. Mot. Dismiss 21, ECF No. 32. Plaintiff's argument seems to suggest that the confidential information that Defendant purchased never truly belonged to Defendant, and that even if it did, the rights reverted upon termination of the License Agreement.

The parties briefing on this issue leaves much to be desired. To plead a claim of misuse of confidential information Plaintiff "must show (1) that a confidential relationship existed; (2) that they disclosed what amounted to confidential information to defendants in the course of that relationship; and (3) that defendants made use of these disclosures." *Those Characters from Cleveland, Inc. v. J.J. Gams, Inc.*, No. 86 CIV. 3180 (VLB), 1992 WL 135580, at *9 (S.D.N.Y. Apr. 13, 1992). The threshold issue is whether or not the contractual arrangement here constituted a confidential relationship. "Under New York law, a confidential relationship is

13

"synonymous with fiduciary relationship and ... [exists] generally where the parties do not deal on equal terms and one trusts and relies on the other." *Stewart v. World Wrestling Fed'n Entm't, Inc.*, No. 03 CV 2468 RLC, 2005 WL 66890, at *4 (S.D.N.Y. Jan. 11, 2005) (citing *Sachs v. Cluett Peabody & Co.*, 265 A.D. 497 (N.Y. App. Div. 1943), *aff'd*, 291 N.Y. 772, 53 N.E.2d 241 (1944)).

Although confidential relationships can arise contractually, *id.*, it is not clear from parties' analysis here whether the contracts at issue created a confidential relationship. Defendant asserts there is no confidential relationship because Defendant purchased the confidential information outright whereas Plaintiff asserts that the information was ostensibly on lease based on certain provisions of the License Agreement. Assuming Plaintiff is correct that the agreements are integrated under New York law, the Court is left questioning whether a conditional asset purchase agreement creates a confidential relationship. Accordingly, the Court will deny Defendant's Motion to Dismiss on this issue without prejudice. Defendant can renew its motion to dismiss this cause of action with arguments that more squarely address the issues raised here.

## IV.    Tortious Interference with Contract

Defendant argues that Plaintiff has not specified the relevant contracts with which Defendant has interfered. Def.'s Mem. Supp. Mot. Dismiss 13, ECF No. 30. The Court agrees. "Tortious interference with contract requires [1] the existence of a valid contract between the plaintiff and a third party, [2] defendant's knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375 (1996). Plaintiff's complaint fails to state a claim as it

cannot point to any specific contracts with third parties it maintained during the pendency of the License Agreement or that Defendant persuaded third parties to breach these contracts without justification. Plaintiff asserts that it identified two existing customers with whom it had contracts. But, during the pendency of the License Agreement, contracts with these customers would have formally belonged to Defendant.[2] Plaintiff does not contest this, but rather asserts that this would not have been the case for all of Plaintiff's customers, such as Disney—a relationship that was a part of Plaintiff's goodwill. Pl.'s Opp. Mot. Dismiss 23-24, ECF No. 32. Plaintiff provides no support for this proposition, and it is not clear that the concept of goodwill extends as broadly as Plaintiff suggests.[3] As such, the allegations in the Amended Complaint, even if considered true do not state a plausible claim for tortious interference with existing contracts.

## V. Tortious Interference with Prospective Business

Defendant argues there is also no tortious interference with prospective business because Plaintiff was not permitted to have business relationships related to its tea products during the pendency of the License Agreement. Def.'s Mem. Supp. Mot. Dismiss 14, ECF No. 30. Here, however, Plaintiff has stated a claim for relief. "A defendant becomes liable for tortious interference with a plaintiff's business relations when four conditions are met: (1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means;

---

[2] Indeed, if that were not the case, then liability for Defendant violating these contracts during this period would be imputed to Plaintiff, which neither parties represent as the bargained for agreement in this case.
[3] Courts have generally understood "goodwill" to refer "to patronage a business receives from 'constant or habitual' customers." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 57 (1993) (Souter, J., dissenting). Goodwill, thus, does not appear to refer to a contractual relationship, but rather a consistent informal relationship.

and (4) the relationship is injured." *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997).

Plaintiff has made allegations that plausibly suggest Defendant's tortious interference with prospective business. Plaintiff, while not a party to contracts with PriceSmart and Disney during the pendency of the License Agreement, still had a business connection to these parties as they actively purchased Plaintiff's products. Assuming Plaintiff's pleading that MSRF and Defendant advised these parties (and potentially others) that Plaintiff was out-of-business is true, there is evidence of intentional interference. As to malice, not meeting third party orders for Plaintiff's products after a termination date for the License Agreement was set and advising third parties to purchase a competing product when it was clear that Plaintiff would be returning to the market may well be evidence of malice. Finally, there is no question that if all of these allegations are true, Plaintiff would have difficulty reinstating these business relationships going forward, as these third parties may have engaged other companies in an attempt to meet the demand that Plaintiff's products previously filled. Therefore, Plaintiff has sufficiently stated a claim of tortious interference with prospective business.

## VI.     Injunctive Relief

Defendant asserts that injunctive relief is not a cause of action, but rather a remedy that can only be incorporated into Plaintiff's other causes of action if injunctive relief is appropriate, which is not the case here. Def.'s Mem. Supp. Mot. Dismiss 15, ECF No. 30; Def.'s Reply Supp. Mot. Dismiss 10, ECF No. 33. The Court agrees and dismisses Plaintiff's Sixth Cause of Action. *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010) ("Injunction is not a separate cause of action; it is a remedy.") (collecting cases).

## VII.     Accounting and/or Inspection of Books and Records

Finally, Defendant argues that Plaintiff's Seventh Cause of Action for Accounting should be dismissed because it is an equitable remedy only available where the parties have a confidential or fiduciary relationship. Def.'s Mem. Supp. Mot. Dismiss 14, ECF No. 30. Plaintiff disagrees, and asserts that the remedy is applicable in circumstances that are broader than those described by Defendant, and that the claim also arises from an express provisions of the License Agreement. Pl.'s Opp. Mot. Dismiss 25, ECF No. 32. Without deciding whether Defendant's argument is correct, the Court holds that it need not exercise its equitable powers as the records Plaintiff seeks will likely be turned over during discovery. *Kaminsky v. Kahn*, 23 A.D.2d 231, 237 (1965) ("The power of equity is as broad as equity and justice require.") (citing *London v. Joslovitz*, 279 A.D. 280, 282, 110 N.Y.S.2d 58 (App. Div. 1952)). Therefore, this cause of action is dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is **GRANTED** in part and **DENIED** in part. Def.'s Mot. Dismiss, ECF No. 29. Plaintiff's Fourth, Sixth, and Seventh Causes of Action are hereby dismissed.


**SO ORDERED.**

Dated: September 4, 2018
     New York, New York

**ANDREW L. CARTER, JR.**
**United States District Judge**